# MICHAEL L. SOSHNICK
*Attorney at Law*

190 WILLIS AVENUE
SUITE 112
MINEOLA, NEW YORK 11501

MICHAEL L. SOSHNICK

OF COUNSEL
JOHN LAWRENCE

TEL (516) 294-1111
FAX (516) 294-5465

August 23, 2011

Sent via ECF
Hon. Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re: United States of America v. Jason Goldfarb
         Docket no.: S1 10 CR 56-03

Dear Judge Sullivan:

  Pursuant to the Order of the court dated August 19, 2011, I am herewith publicly filing my sentencing submissions subject to the Court's approval. I have redacted substantial portions of "Exhibit 2" which consist of confidential aspects of Dr. Kirwin's psychological summary of my client.

  I trust that this public filing complies with the Court's Order.

            Respectfully submitted,

            Michael L. Soshnick

MLS/ds

# MICHAEL L. SOSHNICK
*Attorney at Law*
190 WILLIS AVENUE
SUITE 112
MINEOLA, NEW YORK 11501

MICHAEL L. SOSHNICK
─────────
OF COUNSEL
JOHN LAWRENCE

TEL (516) 294-1111
FAX (516) 294-5465

August 11, 2011

TO BE PLACED UNDER SEAL
*Via Federal Express Overnight Mail*
Honorable Richard J. Sullivan
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:  *USA V. Jason Goldfarb, et al.*
         Docket No.: 10-CR-56-03 (RJS)

Dear Judge Sullivan:

  This letter is submitted to assist the Court in connection with the sentencing of Mr. Goldfarb on August 19, 2011, and shall follow the format adopted by the probation department in its presentence investigation report of August 5, 2011, a copy of which marked Exhibit 1, is attached.

### The Offense and Guilty Plea

  Under Indictment SI 10 CR 56 (RJS), filed in the Southern District of New York, the Government charges Mr. Goldfarb with fourteen (14) counts of having violated 15 USC 78j (b) and 78ff and 17 CFR 240.10b-5 and 240.10b5-2.

  Count One charges that, from at least 2007 through at least 2008 in the Southern District of New York and elsewhere, Mr. Goldfarb and others, using instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, conspired to commit securities fraud in violation of 15 USC 78j(b) and 78ff, and 17 CFR 240.10b-5 and 240.10b5-2(18 USC 371).

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 2-

Count Two charges that, from at least in 2006 through at least 2008 in the Southern District of New York and elsewhere, Mr. Goldfarb and others using instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, conspired to commit securities fraud in violation of 15 USC 78j (b) and 78ff and 17 CFR 240.106-5 and 240.10b5-2 (18 USC 371).

Counts Three through Fourteen charge that on the dates set forth below, in the Southern District of New York and elsewhere, Mr. Goldfarb and others by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities used and employed manipulative and deceptive devices and contrivances, in violation of 17 CFR 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, Mr. Goldfarb and the others caused the listed securities transactions to be executed on the basis of material nonpublic information (15 USC 78j(b) and 78ff; 17 CFR 240.10b-5 and 240.10b5-2; 18 USC 2).

### Forfeiture Allegation

As a result of committing one or more of the securities fraud offenses alleged in Counts 1 through 14 of the Indictment, Mr. Goldfarb and others shall forfeit to the United States, pursuant to 18 USC 981(a)(1)(C) and 28 USC 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses, including, but not limited to, at least a sum of U.S. currency which was derived from proceeds traceable to the commission of the securities fraud offenses.

On April 21, 2011, Mr. Goldfarb appeared before this Court and pleaded guilty to Counts 1 and 3 of the Indictment in accordance with a plea agreement. Count 1 carries a penalty of up to 5 years imprisonment; up to 3 years supervised release; a maximum fine of $250,000.00; and a special assessment of $100.00. Count 2 carries up to 20 years

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 9, 2011
Page 3-

imprisonment; up to 3 years supervised release; a fine set at the greater of $5,000,000.00 or twice the gross gain or loss; and a special assessment of $100.00.

The plea agreement stipulates, in pertinent part, that:
1. The base offense level is eight under section 2B1.4(a).
2. The base offense level is increased by 16 levels pursuant to section 2B1.1(b)(1)(l) and section 2B1.4(b)(1) because the gain from the offenses reasonably foreseeable to Mr. Goldfarb approximated $1,103,131.00
3. Should Mr. Goldfarb demonstrate acceptance of responsibility, to the satisfaction of the Government through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction shall be warranted pursuant to section 3E1.1(a). Assuming acceptance of responsibility by Mr. Goldfarb, an additional one-level reduction is warranted under section 3E1.1(b) given that Mr. Goldfarb gave timely notice of his intention to enter a plea of guilty which permitted the Government to avoid having to prepare for trial and allocate its resources efficiently.
4. The applicable Guidelines offense level is 21.
5. Based upon the information available to the Government, Mr. Goldfarb has no criminal history and his Criminal History Category is 1.
6. Mr. Goldfarb's calculated range is 37 to 46 months imprisonment.
7. The applicable fine range which may be imposed, subject to Mr. Goldfarb's ability to pay, is $7,500.00 to $5,000,000.00.
8. Mr. Goldfarb admits to the forfeiture allegation.

### Adjustment to Pretrial Supervision

9. Mr. Goldfarb has been in full compliance with all of the conditions pertaining to his pretrial supervision.

### Victim Impact

10. The subject offense involved insider trading. There is no readily identifiable victim or loss. The loss relates to the other shareholders who would have received a higher rate of return on their legitimate investments had Mr. Goldfarb and the other defendants, with assessed higher levels of culpability, not derived a profit from the mergers based on illicitly obtained information.

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 9, 2011
Page 4-

### Adjustment for Obstruction of Justice

11.   The probation department has no information to suggest that Mr. Goldfarb impeded or obstructed justice at the time of his arrest or during the investigation or prosecution of the offense.

### Adjustment for Acceptance of Responsibility

12.   Mr. Goldfarb did not provide an inculpatory statement on the advice of his attorney. During the plea allocution, Mr. Goldfarb admitted to having relayed confidential stock information received from Brien Santarlas and Arthur Cutillo to Zvi Goffer who then used the information to purchase public stocks. Goffer paid Santarlas, Cutillo and Goldfarb for the information.

13.   Family problems, coupled with mounting financial difficulties, motivated Mr. Goldfarb's proscribed behavior. His father's failing business fell short of generating the necessary funds to provide continued health care coverage in relation to his mother's cancer treatment. Outstanding student loans weighed heavily on Mr. Goldfarb and his desire to secure additional money to handle these staggering liabilities and obligations.

14.   Mr. Goldfarb deems it essential for this Court to know that his "mistake" did not affect his job performance or dedication and commitment to his clients whom he describes as needy and hardworking. The realization that he will no longer be able to represent them is quite bothersome and troubling to him.

### Offense Level Computation

15.   In accordance with the November 1, 2010 edition of the Guidelines Manual, Counts 1 and 3 of the Indictment are grouped together, pursuant to section 301.2(b), in that the subject offenses constitute part of a single course of conduct with a single criminal objective. The applicable guideline for the group is section 2B1.4 which provides for a base offense level of 8 (section 2B1.4(a)).

9.   Since Mr. Goldfarb is accountable for profits of $1,103,131.00 from trades made by the co-defendants, the offense level is increased by 16 levels (section 2B1.1 (b) and section 2B1.4(b)(1)). The adjusted offense level (subtotal), after giving due consideration to victim-related adjustments (0); adjustments for obstruction of justice (0); adjustments for role in the offense (0) is 24. A reduction of three levels for

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 9, 2011
Page 5-

acceptance of responsibility is applicable under section 3E1.1(a) and (b) thereby leaving an adjusted level of 21 with no Chapter Four Enhancements reduction. The total offense level is 21.

### Defendant's Criminal History

17. According to the FBI and the New York State Division of Criminal Justices Services, Mr. Goldfarb has no criminal convictions: zero criminal history points; and a Criminal History Category of 1.

### Offender Characteristics

18. Mr. Goldfarb is thirty-three years of age having been born on May 5, 1978 to Marcel Goldfarb and Nancy Tricka. His brother, Noah Goldfarb, is twenty-nine years of age; resides in Hicksville, New York; and is employed as a hairdresser. He comes from a middle class neighborhood in Brooklyn, New York; and maintains good relationships with his parents and brother.

19. He presently resides with his fiancée, Robin Kowalski; at 317 East 85th Street, PHC, in Manhattan. Ms. Kowalski, an oncology nurse, is thirty years old. The two have shared a good relationship since 2005. Their plans to marry and raise a family are on hold pending the outcome of the underlying criminal matter. As set forth in the presentence report, Ms. Kowalski believes that there is no risk of recidivism on the part of Mr. Goldfarb given his strong family ties and the mental health, alcohol and gambling treatment he is being afforded.

### Mental and Emotional Health

20. Mr. Goldfarb has a history of chronic anxiety, agitated obsessive compulsive behavior that dates back to his pre-adolescent years. The need to seek treatment reached its pinnacle at the time of his arrest whereupon he sought the services of Barbara R. Kirwin, Ph.D., ACFP, ACFEI, a clinical forensic psychologist, with an office in Huntington, New York.

21. Dr. Kirwin conducted a clinical interview, history taking and mental status exam on January 31, 2010. Thereafter, she administered objective psychological tests on February 4, 2011(MMP1) and April 4, 2011(16PF); conducted conversations and interviews with Mr. Goldfarb's mother, fiancée, former attorney, current attorney,

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 6-

employer and probation officer; reviewed documents, papers and records pertaining to Mr. Goldfarb's personal finances; considered a myriad of character letters submitted on behalf of Mr. Goldfarb as well as material pertaining to the case; rendered psychotherapy treatments to Mr. Goldfarb on a weekly then bi-weekly basis from January 31, 2011 to the present, all of which culminated in her psychological evaluation, dated June 25, 2011, a copy of which, marked Exhibit 2, is attached.

22. Dr. Kirwin administered the following tests to Mr. Goldfarb: The MMPI-2, a clinical diagnostic inventory, and the 16PF, an instrument for assessing personality functioning. His validity profile indicated that Mr. Goldfarb is confused, distractable and enduring memory problems due to his intense level of anxiety. He exhibits a severe degree of distress and personality deterioration.

23. Most of the clinical scales in Mr. Goldfarb's profile are at elevated levels which is indicative of a pattern of chronic psychological maladjustment. He is overwhelmed by anxiety, tension and depression and lacking in psychological sophistication and emotional maturity. He demands very much of himself and consistently pushes himself to exceed his capacities in terms of being responsible for things that should be taken care of by others This trait leads him to worry to excess and interpret even the most neutral events as problematic.

24. His self-critical nature prevents him from viewing relationships in a positive manner. He possesses a meager capacity to experience pleasure in life. Despite his outward friendliness and apparent social ease, he is a pessimistic loner at heart.

25. It is interesting to note that even his pre-trial probation officer, Jennifer Powers, observed his state of anxiety and agitation and his reticence to disclose or discuss his personal feelings. His participation in treatment caused her to be encouraged.

26. Mr. Goldfarb's elevated MMPI-2 code type is 6-4 which is very rare in samples of normal people; occurring in less than 1% of men. His relatively high score on the AAS scale suggests a risk factor for alcohol abuse. His psychological profile illuminates many serious warning signals of impending psychological breakdown if these issues are not appropriately addressed in treatment. As the elevation of scales 4 and 6 continues and as scale 6 becomes higher than scale 4, the likelihood of a pre-psychotic disorder becomes more likely.

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 7-

27.  Though Mr. Goldfarb minimizes his problems, he does admit that he experiences extreme distress regarding his phobia of dirt and germs. He is also extremely perfectionistic and compulsive in his wash habits and personal grooming and still has his mother do his laundry and iron his shirts because he cannot tolerate the thought of putting his clothes in a public washing machine.

28.  MMPI-2 Supplementary Scales reveal that Mr. Goldfarb is currently extremely anxious and depressed; he is greatly suffering internally. His "go to" defense mechanism of repression that he has employed most of his life to mask these painful feelings is no longer viable and he is becoming overwhelmed.

29.  The nature and severity of Mr. Goldfarb's elevated clinical scales warrant analysis in order to shed light on the nature and severity of his chronic psychological problems and to clarify his reduced mental capacity which directly contributed to his illegal conduct

a) Scale 1 (Hypochondrias) not only refers to bodily concerns, but is a crude index of the person's psychological mindedness or sophistication. Mr. Goldfarb endorses an extreme number of somatic symptoms such as tachycardia; chest pains; burning; tingling crawling in parts of his body; pains in the back of his neck; headaches; convulsions, tinnitus and fatigue. He complains of insomnia and gastrointestinal symptoms of his anxiety such as discomfort in the pit of his stomach and loss of appetite. The restlessness he experiences is of such intensity that he cannot sit still due to his feeling that something dreadful is about to present itself. Stress is with him almost all the time and drives him to feel that he is about to go to pieces. His repressed emotional issues are being expressed through physical symptoms. What is quite telling is that Mr. Goldfarb's extremely high score on this scale describes his lack of interest in exploring any psychological reason or reasons for his physical complaints. He remains pessimistic; sour on life; and evidences long-standing feelings of personal inadequacy and ineffectiveness which he masks by being hyper-responsible for those around him.

b) the Scale 2 (Depression) score is in the range where there is a serious suicide risk. His behavior is marked by a great deal of brooding over his troubles; an overwhelming sense of sadness; despair about the future; and mental distress and inertia. Life has become a strain for him; no longer worthwhile. He has considered suicide on more than one occasion and is so ashamed of his actions and conduct that he sees himself as "no good at all" and "useless" all because he has "made a bad mistake" in life. Mr. Goldfarb's treatment protocol is complicated to the extent that the use prescription

psychotropic medications is contraindicated by this penchant for alcohol abuse which he often augments with other controlled substances to blot out the pain of his intolerable anxiety.

        c) Scale 7 (Psychastheria) is designed to assess a neurotic obsessive-compulsive syndrome which is characterized by Mr. Goldfarb's inability to resist specific actions or thoughts regardless of their maladaptive nature. Aside from the obsessive-compulsive features, Scale 7 taps abnormal fears, self-criticism, concentration difficulties and feelings of guilt. This scale is an important component of Mr. Goldfarb's personality make-up and directly contributes to this overwhelming and reflexive need to rescue others.

        d) Mr. Goldfarb's elevation on Scale 8 (schizophrenia) measures a wide variety of symptom areas including bizarre thought processes; breaks with reality; peculiar perceptions; concentration difficulties; poor impulse control; lack of deep interest; and disturbing questions of self worth and self identity. He is emotionally like a young child caught up in an adult world; hence, his preference in dealing with his cats over that of interpersonal contacts or relationships. His scores on the schizophrenia subscales indicate high levels of social and emotional aberration; defects in cognition and emotions; compromised ability to control his obsessions; and resulting deficits in judgment.

        e) The high score on the Bizarre Mentation scale suggests that Mr. Goldfarb is likely to be experiencing symptoms of a thought disorder. His psychological distress becomes extreme when subject to environmental stressors that serve to tax his fragile self-concept. A person such as Mr. Goldfarb, whose OCD is exacerbated by an underlying obsessive-compulsive personality disorder, can assume a breakdown of psychotic proportions to the point where thinking, judgment and impulse control are severely impaired.

        f) The results on the 16PF, which measures personality functioning, are consistent with the profile obtained in his MMPI-2. He scored in the top 95 percentile on measures of tension and anxiety; indicators of personality disintegration; and need for psychological treatment. He is self-sufficient and resourceful to a fault and tends to prefer his own decisions and assume excessive responsibility for those around him. There can be no doubt that he is a driven Type A perfectionist who gives everyone and anyone a break but will never do the same for himself.

    30.    Mr. Goldfarb disclosed his predisposition for solitary drinking when under stress. Moreover, he admitted to having an obsession with online sports betting which took over his life, despite the limited availability of funds, and drove him to ignore family and friends and his relationship with Ms. Kowalski. Despite the tremendous strides Mr.

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 9-

Goldfarb has made in recognizing the havoc alcohol abuse and gambling create in his relationships, he will admit that, when confronted with mounting stress in his life, he often finds it impossible to control. However, he is most fortunate to have in place an interpersonal network comprised of family, his fiancée and his trusted mentor and confidant, Joseph Romano, his employer. It is this network that serves as a readily available source of support and strength and, in effect, provides him with a safety net in the community. The manifestation of these traits transcend the circle of those close to Mr. Goldfarb. Probation Officer, Jennifer Powers, indicated to Dr. Kirwin that she perceived him to be fragile and driven and in need of psychological help.

31. Irrespective of his pathology, Mr. Goldfarb is imbued with a sense of honesty and frankness that enamors him to people with whom he interacts. He is up-front and candid about his situation with his associates and clients and is highly regarded by people from all walks of life. He has demonstrated the poise and strength to absorb the pain and humiliation associated with the salacious press he has received in connection with this action and has devoted himself to affording clients his most zealous efforts to protect and advance their interests.

32. The deep seated regard and respect that so many people have for Mr. Goldfarb may be appreciated through the multitude of letters submitted in support of him as a decent, caring human being who, is deserving of a second chance and being spared from any period of incarceration. Letters received from family members and loved ones may be said to be expected and of minimal impact. However, letters from clients, clergy, professionals, colleagues, attorneys, law judges, friends, physicians all attesting strongly to his civility and compassion; his penchant for helping others; his professional integrity and commitment; his misapplied motivation for the proscribed conduct; his lack of greed or avarice; and his use of the money to save his mother cannot be minimized, ignored or considered lacking in persuasive impact.

33. The letter submitted by Kathleen Capalbo bears scrutiny in that it provides keen insight into the essence of Mr. Goldfarb not only as a lawyer but as a decent and virtuous individual. Ms. Capalbo's happy existence crumbled in July, 2007, when her husband of twenty-two years suddenly became ill with Burkitts Lymphoma after twenty years of radiation exposure while employed at the Indian Point nuclear facility. Two different lawyers took the case but retreated from pursuing the claim because Indian Point with its "dream team" of lawyers presented too formidable an adversary and, in the end, would prevail. After being referred to Mr. Goldfarb, the complexion of the case changed dramatically because of his perseverance and dedication. His accessibility, civility and dedication turned Mrs. Capalbo's life around. In short, Goliath capitulated giving way to a comprehensive settlement for her family that enabled her two sons to complete college and pursue graduate school. Moreover, Mrs. Capalbo's health

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 10-

improved; her insomnia waned; and her bills due to the lifetime ongoing benefits Mr. Goldfarb got her were now paid without any lingering residue of worry, panic or apprehension.

  34. The letter submitted by Lancelot Favorite is quite informative to the extent that many of Mr. Goldfarb's clients, once apprised of his pending difficulties believed in him to such an extent that they followed him to his new firm in order to continue their relationships with him.

  35. The letter submitted by Judge William Donovan, a Judge before whom Mr. Goldfarb appeared on a daily basis for many years clearly showed how well respected he is and was amongst his peers. He noted how zealous, well prepared and compassionate Mr. Goldfarb was in dealing with all his clients and cases. He even noted how his duties were always performed in an ethical manner, while always putting his clients first.

  36. The letter submitted by the Reverend Michael J. Champion speaks volumes as to the care and consideration Mr. Goldfarb afforded him as a client and now a friend. Mr. Champion came to know Mr. Goldfarb after he had fallen ill with breathing problems due to his exposures from being down at Ground Zero as a priest volunteering by performing last rites on recovered bodies immediately following the attacks of 9/11. He described how hard Mr. Goldfarb fought against these insurance carriers trying to keep him from receiving the benefits he so desperately needed and deserved. In short, these people I have referenced knew the true man and were convinced that greed did not compel him to violate the law; rather, it was clouded judgment predicated solely on a need to assist his family.

  37. At the risk of sounding redundant, it must be emphatically asserted that Mr. Goldfarb's uncharacteristic involvement in the criminal activity for which he stands convicted, after having accepted full responsibility, is implacably rooted in his literal perception that his mother faced a life and death situation and that financial ruin and devastation engulfed his father. His method for raising the money to forestall the impending disaster, based on his warped and imbalanced sense of responsibility, must be deemed aberrant. A family triangulation meshed perfectly with his OCD and pathological need to create the perfect storm which set the direction for his anti-social, misguided behavior. At the moment of inception, the pathological forces driving the enterprise could not be denied, curtailed or derailed by rational thinking. It spiraled out

Case 1:10-cr-00056-RJS   Document 241   Filed 08/25/11   Page 12 of 17

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 11-

of control and did not dissipate away until the hard core reality of the situation propelled the pendulum back to the center at the time of his arrest.

38. Mr. Goldfarb's thinking reveals the external locus of control that a person has with OCD and addictions. Simply stated: he or she is compulsively unable to stop the pathological behavior and rely on anyone to intervene and apply the controls he or she desperately lacks. Mr. Goldfarb is caught up in a living nightmare marked by deep seated anxiety and fear over incarceration; an inordinate amount of guilt, humiliation and embarrassment; and an acute sense of having failed his parents, his fianceé, his brother and his friends and even his clients. Given his psychological issues and fragile emotional state, he is finding it difficult to function.

39. Dr. Kirwin is of the opinion that Mr. Goldfarb's abuse of alcohol and pathological gambling was not a voluntary dependence but a symptomatic outgrowth of his chronic anxiety and obsessive-compulsive disorder. The significantly diminished capacity that resulted from his chronic and pervasive mental illness together with his self-sacrificing devotion to his parents must be appreciated by the Court because these dynamics contributed substantially to the commission of the offenses in question. Thus, at a minimum, the Court should afford Mr. Goldfarb a hearing concerning this aspect of his mental health history.

40. The Court is asked to acknowledge Dr. Kirwin's specialized training and experience with substance abusers, pathological gamblers, dangerous felons and the criminally insane when considering her clinical opinion that Mr. Goldfarb presents no risk of recidivism; is motivated to continue treatment; is not a danger to himself or others; and poses no threat to the public safety or the community welfare. Stringent and structured insight oriented psychotherapy will help Mr. Goldfarb learn to express his emotions in a healthy and appropriate fashion and to manage his anxiety without resorting to obsessive-compulsive rituals, germ phobias and addictive behavior.

41. Mr. Goldfarb has learned a painful and difficult lesson from this unfortunate and devastating experience. He has endured tremendous guilt and remorse in relation to having violated the law and having hurt and inflicted pain and anguish on those whom he loves dearly. If not provided with psychological treatment, alcohol abuse and gambling interventions, he may be at risk for a suicide attempt.

42. Mr. Goldfarb lives with a level of guilt and remorse that is agonizing and overwhelming. There have been numerous occasions when he has thought of "ending it all" and "never waking up again". He is an excellent candidate for rehabilitation and will

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 12-

continue to be an upstanding member of society. The clinical concern of Dr. Kirwin is that the Cyclothymic Disorder which Mr. Goldfarb currently suffers from will progress and develop into full blown Bipolar II Disorder coupled with a significant risk of suicide. He must be monitored and supervised through continued regular comprehensive psychotherapy. Confinement in a correctional facility, which fails to provide the intensive mode of treatment required to effectively deal with Mr. Goldfarb's complex pattern of mental health issues, could accelerate his deterioration; impede his rehabilitation; and exacerbate the risk of suicide.

### Sentencing Options

43.   The maximum term of imprisonment for Count 1 is five years (18 USC 371). The maximum period of incarceration for Count 3 is 20 years (15 USC 78j(b) and 78ff; 18 USC 1341; and 18 USC 1343). Based on a total offense level of 21 and a Criminal History Category of 1, the Guideline range for imprisonment is 37 to 46 months.

44.   If a term of imprisonment is imposed in relation to Counts 1 and 3, the Court may impose a term of supervised release of not more than three years (18 USC 3583 (b)(2)); such terms of supervised release to run concurrently (18 USC 3624(e)).

45.   Under the applicable provisions of the Guidelines, the range for a term of supervised release is at least two years but no more than three years (section 5D1.2(a)(2)). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional (section 5D1.1 (b)). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute (section 5D1.1(a)).

### Probation

46.   Under Counts 1 and 3, Mr. Goldfarb is eligible for not less than one or more than five years probation by statute (18 USC 3561(c)(1)). Probation is not an option under the Guidelines because the applicable range is in Zone D of the sentencing table (section 5B1.1).

### Fines

47.   Despite the possible fine and assessment parameters set forth in the presentence investigation report, Mr. Goldfarb is not possessed of the requisite resources to be expected to satisfy the imposition of fines and assessments. His total assets, as of June 20, 2011, amounted to $3,932.00. This figure is to be adjusted by a total unsecured

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 13-

debt of $8,970.00 resulting in a paultry negative net worth of -$5,038.00. Also noteworthy, are law school student loans of $98,730.22 which are owed for a license that he will be unable to use. After expenses, Mr. Goldfarb's net monthly cash flow is $1,289.00 which is hardly enough to absorb and liquidate any significant imposition of fines and assessments.

### Downward Departure

48.     As the presentence investigation report clearly states: a downward departure based on Mr. Goldfarb's mental condition may be relevant in determining whether a departure is warranted, if such condition, standing alone or in conjunction with the other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the Guidelines. Dr. Kirwin's report addressed the issue exhaustively and presented keen insight into the unusual nature, complexity and severity of Mr. Goldfarb's mental condition and the extent of its persuasive influence with respect to his behavior. In light of the United States v. Menyweather, 431 F.3d 692, Mr. Goldfarb should be afforded a hearing whereby Dr. Kirwin may testify as to her opinion of diminished capacity.

### 18 USC Section 3553

49.     The holding in United States v. Booker, 125 S.Ct 738 (2005) established the controlling principle that the Federal sentencing guidelines are not binding but rather merely advisory. The sentencing court is under a duty to consider the guidelines in conjunction with the factors enumerated in 18 U.S.C, section 3553 (a) and then proceed to determine whether to impose a "non-guidelines" sentence (see, United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Reasonableness serves as the standard in connection with appellate review (see United States v. Howard, 454 F.3d 700, noting that traditional guideline departures have been rendered obsolete in the post- Booker world).

50.     In United States v. Keith Jones, Judge Raggi, writing for the Second Circuit Court of Appeals, noted that while the sentencing court is statutorily obligated to give fair consideration to the guidelines before pronouncing sentence, when all is said and done, it comes down to an individualized assessment, pursuant to section 3553 (a), based on the facts presented. Deference to the guidelines can not serve to negate or pre-empt the court's unique ability to render the all important assessment. The institutional experience of the sentencing court imparts the requisite familiarity and credibility to elevate its decision making competence. In addition, the sentencing court occupies a superior position to find facts relevant to sentencing and to appreciate their importance and relevancy under section 3553 (a).

51. Sentencing is by no means a precise science. It stands to reason that pertinent facts will never dictate one and only one appropriate sentence. Reasonable experienced district court judges may reasonably differ as to the weight and sufficiency of certain facts and their relative significance with respect to the pronouncements of sentences. These observations only support and highlight that in most cases a range of sentences extending beyond the parameters prescribed by the guidelines must be deemed reasonable.

52. The following criteria, provided for in 18 U.S.C. Section 3553 (a), must be considered to insure the imposition of a sentence sufficient, but not greater than necessary, to comply with paragraph 2 of the stated subsection:

> A) the nature and circumstances of the offenses and the history and characteristics of the defendant;
> 2) the need for the sentence to be imposed;
> A) to reflect the seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense;
> B) to afford adequate deterrence to criminal conduct;
> C) to protect the public from further crimes of the defendant;
> D) to provide defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner;
> 3) the kinds of sentences available;
> 4) the kinds of sentences and the sentencing range established for:
> A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;
> 5) any pertinent policy statement (issued by the Sentencing Commission); the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and;
> 6) the need to provide restitution to any victims of the offense.

53. The Court's attention is drawn to Mr. Goldfarb's immediate willingness to cooperate with the government and which led to his participation in proffer sessions with the United States Attorney and the FBI. At these sessions, Mr. Goldfarb presented a concise understanding of the criminal enterprise; the players involved; the operation and the distribution of funds. In addition, he produced a detailed accounting of the different stock transactions in the handwriting of the co-defendant; Zvi Goffer. The government proceeded to use the document as an exhibit at the trial of Mr. Goffer. Though not the

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 15-

recipient of a 5K letter, Mr. Goldfarb remained steadfast in his resolve to cooperate and testify, if needed, at the trial of Mr. Goffer. His cooperation did contribute to Mr. Goffer's conviction and may be considered by the Court in accordance with the holding in United States v. Fernandez, 443 F. 3d 19 (2d Cir. 2006).

54. Another component part of Mr. Goldfarb's willingness to render assistance to the government can be seen in the civil lawsuit commenced by the Securities and Exchange Commission. In his letter to me of August 11, 2011, Jordan M. Freundlich, of Kokis, Klig & Freundlich, attorneys for Mr. Goldfarb, presents an update relating to Mr. Goldfarb's desire to cooperate fully with the SEC; his good faith disclosure of all the information available to him regarding specific stocks; and his answering of several follow-up questions posed by Brian Vann of the SEC in Washington, D.C. Mr. Goldfarb's cooperation has set the stage for the basis of a settlement agreement with the SEC and prompted a response by the SEC that it will voice no objection to Mr. Freundlich's letter being submitted to the Court on behalf of Mr. Goldfarb. A copy of Mr. Freundlich's letter, marked Exhibit 4, is attached. Mr. Goldfarb's desire to help the government in any and every way he possibly can has been clear and remains ongoing.

55. While not endeavoring to make light of Mr. Goldfarb's unlawful conduct, the argument must be made that the particular facts surrounding his participation warrant a departure from the guidelines in that he became involved for reasons quite disparate and diverse from the co-defendants. Greed or illegal gain never entered Mr. Goldfarb's mindset. Dr. Kirwin's report went to great lengths to edify the Court about the complex and powerful dynamics influencing and contributing forcefully to his behavior. An overwhelming compulsion to rescue his parents from their health and financial woes pushed Mr. Goldfarb to act in such an irrational and pathological manner.

56. A review of the factual narrative relating to the execution of the trading scam will establish that Mr. Goldfarb acted in the capacity of a middle man for the key players. Unlike this cohorts, who earned big money as corporate attorneys, Mr. Goldfarb worked an employee for a workers' compensation firm. His take for his role acting as the "go between" at the request of both sides amounted to $32,500.00. Mr. Goldfarb can also be distinguished from all the other defendants in that he is the sole defendant in this matter where the charges involved have nothing to do with his employment/job.

57. Every penny received found itself being used to help his mother continue with her cancer treatments and to help his father defray the ever mounting array of bills that seemed to forecast his mother being denied continuation of the necessary treatment to deal with her weakening condition. His father's desperate plea for assistance only served

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
August 11, 2011
Page 16-

to add greater intensity to the pathological forces churning inside of him to rectify the situation single handedly. He could not refuse; not after the ways in which his parents sacrificed for him. He had to act and act quickly. The perfect storm of pathologies that controlled him for years kicked into gear and blinded him from perceiving the insanity of moving ahead to secure the needed money. He could not have turned back even if possessed of the mental stability to appreciate the illogical nature of the contemplated venture. He compulsively played the role emotionally demanded of him without ever making a single trade on the basis of the insider information; all of his actions were undertaken as a conduit to enable the fat cats to score and pocket their ill-gotten gains.

58. The record shows that Mr. Goldfarb has no prior criminal history; accepted responsibility for his behavior; cooperated with the government; continues to cooperate with the Securities and Exchange Commission; and has conducted himself ethically throughout the entire ordeal in reference to his clients and the advancement of their interests.

### Conclusion

59. In view of the compendium of information submitted to this Court in support of the character and deserving nature of Mr. Goldfarb, as well as the interests of justice, I ask that a departure from the guidelines be made and that Mr. Goldfarb be sentenced to a period of probation, home confinement and community service together with psychological treatment conditions ongoing with Dr. Kirwin; and that the imposition of a fine be waived due to the $32,500 forfeiture that Mr. Goldfarb has acknowledged and agreed for the Court to impose, as well as an inability to pay in light of Mr. Goldfarb's limited resources and imminent disbarment.

Respectfully submitted,

/S/

Michael L. Soshnick